Bobbie NICHOLSON *v.* STATE of Arkansas

CR 94-982                                     892 S.W.2d 507

Supreme Court of Arkansas
Opinion delivered February 20, 1995
[Rehearing denied March 27, 1995.]

*Adams & Evans*, by: *Don J. Adams*; *Ralph J. Patterson*; and *Russell L. "Jack" Roberts*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Bobbie Nicholson was convicted of murdering her husband, Don Nicholson, with premeditation and deliberation in violation of Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1993). She was sentenced to life in prison without parole. Her points of appeal are (1) that the Trial Court lacked jurisdiction of the offense, (2) that hearsay testimony was erroneously admitted against her, and (3) that it was error to permit the testimony by an expert expressing an opinion which had not been provided to her before the trial. We find no error and affirm.

The evidence was circumstantial. From the testimony presented, these facts could have been determined by the jury. In the early morning hours of September 15, 1992, Don Nicholson died in a motel room in Marshall. The Searcy County Coroner ruled the death to be the result of a heart attack. A subsequent autopsy performed at the request of Mr. Nicholson's children from a previous marriage revealed he had been poisoned with a combination of ethylene glycol, a substance found in anti-freeze, and tolbutamide, a drug used to treat diabetics. Codeine and Valium were also found in his system.

Mr. Nicholson maintained homes in Greenville, Mississippi, and in Jesseville. In September he was in Greenville where he had family and friends. He made some statements, which became the subject of the hearsay objection at the trial, that he was not satisfied with his marriage to Bobbie Nicholson and planned to file for divorce within a matter of weeks. While in Mississippi, he also mentioned he was seeing another woman.

Upon Mr. Nicholson's return to Arkansas, he and Mrs. Nicholson, who worked on an "agency" or "as needed" schedule as a Licensed Practical Nurse, began a trip to Harrison to visit Mrs. Nicholson's mother who was ill. At around 5:00 p.m., September 14, they stopped at Marshall because, Mrs. Nicholson later told officials, Mr. Nicholson was vomiting and was too sick to go on. Her statement to Mr. Nicholson's children was that they stopped because he was just too tired to drive the additional

forty miles to Harrison. She registered at the motel as "Bobbie Graham." Chester Ballard, a guest at the motel, testified he helped get Mr. Nicholson, who was having trouble walking and talking, from the van into the motel room. He said Mrs. Nicholson explained to him that Mr. Nicholson was having a "seizure."

Chay Phung, the owner and manager of the motel, stated that Mrs. Nicholson returned to the main lobby and restaurant about twenty minutes after checking in to get extra towels, a blanket, a glass of orange juice, and a vegetable plate. When he offered to help her carry these items back to her room, Mrs. Nicholson told Mr. Phung that she could handle it.

Gay Phung, Mr. Phung's wife, testified she was working in the restaurant when Bobbie appeared to get the vegetable plate and orange juice. Both Mrs. Phung and Camilla Pratt, a waitress, testified that Bobbie appeared nervous and jumpy, and that she "stole" packets of sugar as she ordered the orange juice, apparently not wanting to be observed taking them.

The next contact Mrs. Phung had with Mrs. Nicholson came the following morning after it was discovered that Mr. Nicholson had died. Mrs. Phung testified that Bobbie added the name "Nicholson" to "Bobbie Graham" as it appeared on the motel registration card and told her it was to insure that her husband's company would pay the motel bill.

Initially, Mrs. Nicholson was the only source of information concerning Mr. Nicholson's last moments of life. She told police that he and she went to bed at about 10:00 p.m. and that she awoke at about 4:00 or 4:30 a.m. on September 15. She said Mr. Nicholson told her to shower first while he got more sleep. After she finished showering, she told police, she heard a moan and found Mr. Nicholson foaming at the mouth. Because the rooms at the motel did not have phones, she went across the street to a convenience store and told the clerk to dial 911 because her husband was having a heart attack.

The convenience store clerk was Jeffery W. Smith. Mr. Smith testified that Bobbie came into the store and asked him to dial 911. He said that he thought she was a traveler because her clothes were rumpled. It did not appear that she had just been in the shower as her hair was not wet. When he went over to the motel

later that morning to offer help, he noticed that Mrs. Nicholson was dressed up and on her way back home.

Spring Lutz was one of the Emergency Medical Technicians (EMT) who responded to the call. She testified that when she arrived in the Nicholsons' room, she found Mr. Nicholson in one of the beds. When she began to examine him, she found he was cold to the touch and that his blood had begun pooling, indicating that he had been dead for some time and that emergency procedures to revive him would be useless. She also testified that Mrs. Nicholson told her that Mr. Nicholson had gasped his last breath as she emerged from the shower approximately ten minutes before the ambulance arrived, which Ms. Lutz claimed was inconsistent with what she observed from the condition of the body. It was also inconsistent with Ms. Lutz's observation that Mrs. Nicholson was wearing a "dressy" pantsuit, had make up on, and her hair curled when the EMT arrived.

After the Searcy County Coroner determined that the apparent cause of death was a heart attack, Mrs. Nicholson arranged for the body to be sent to Mississippi for burial. When she discussed Mr. Nicholson's death with his children, her account of his last moments varied somewhat from the story that she had told the police, the EMT, and the coroner. Because of the suspicious circumstances of their father's death, the children sought a court order for an autopsy. Mrs. Nicholson, who was opposed to the idea, called the prosecutor in an effort to convince him not to seek the order.

The autopsy and pathology report revealed the apparent cause of death was the combination of the ethylene glycol and the tolbutamide, and the location of these substances in certain organs indicated that they were ingested no more than twenty-four hours prior to death.

After the results of the autopsy were obtained, further investigation revealed that Mrs. Nicholson was the beneficiary of a $100,000 policy on Mr. Nicholson's life and was the beneficiary of his will. Greenville, Mississippi, lawyer Steve Thomas, who was one of the witnesses who said Mr. Nicholson had said he was unhappy in his marriage and intended to end it, had prepared wills for the Nicholsons in 1988. Mrs. Nicholson was to receive Mr. Nicholson's property if she survived him, and vice-versa,

with their children as secondary beneficiaries. It was also discovered that she continued paying the insurance premiums after he had stopped making payments in May 1992 due to the financial difficulties of the company issuing the policy.

### 1. Jurisdiction

Mrs. Nicholson argues that the time Mr. Nicholson ingested the poisons was not definitely established, thus there is no evidence that the alleged murder took place in Searcy County.

Article 2, Section 10, of the Constitution of Arkansas states, in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by impartial jury of the county in which the crime shall have been committed . . . ."

Arkansas Code Ann. § 16-88-108(c) (1987) provides:

> Where the offense is committed partly in one county and partly in another, or the acts or effects thereof, requisite to the consummation of the offense occur in two (2) or more counties, the jurisdiction is in either county.

The only evidence Mrs. Nicholson cites to support her argument is the testimony of Dr. Timothy Hayne, the forensic pathologist who performed the autopsy on Mr. Nicholson. She argues that Dr. Hayne testified that ingestion of the lethal chemicals occurred "near" twenty four hours prior to death, and that the Nicholsons were at the motel for only twelve hours. Based on that evidence, she contends the ingestion of the ethylene glycol and tolbutamide must have occurred before the couple reached Searcy County.

Dr. Hayne's testimony was that Mr. Nicholson ingested the chemicals *within* twenty-four hours or less of his death, and not that it was at least twenty-four hours before, as Mrs. Nicholson suggests. Dr. Hayne testified that ethylene glycol is processed by the body in at least three stages, and that each stage indicates the approximate time the substance has been in the person's system. Mr. Nicholson had not reached the elimination phase or final stage which would have occurred at least one day after ingestion. From this finding, Dr. Hayne was able to testify with reasonable certainty that Mr. Nicholson had ingested the chem-

icals within twenty-four hours of his death. In addition, he testified that death could occur at any of the three stages of ingestion of ethylene glycol, and that the effects of this substance are enhanced somewhat by the presence of tolbutamide.

■ The State need not prove jurisdiction "unless evidence is admitted that affirmatively shows that the court lacks jurisdiction." Ark. Code Ann. § 5-1-111(b) (Repl. 1993). Before the State is called upon to offer any evidence of jurisdiction, there must be positive evidence that the offense occurred outside the jurisdiction of the court. *Dix* v. *State*, 290 Ark. 28, 715 S.W.2d 879 (1986); *Gardner* v. *State*, 263 Ark. 739, 569 S.W.2d 74 (1978), cert. denied, 440 U.S. 911 (1979). No such positive evidence was presented.

### 2. Hearsay

Mrs. Nicholson contends the Trial Court erred in admitting statements to the effect that Mr. Nicholson was planning to divorce her. She argues the statements should not have been found to fall within the state-of-mind exception to the hearsay rule.

Rule 803 of the Arkansas Rules of Evidence provides, in part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.
>
> * * *

Mrs. Nicholson contends this rule applies only to "then existing mental, emotional, or physical conditions . . . ," and not the intentions of the declarant. She also argues that the last sentence of

the exception limits the admissibility of statements concerning intent, plan, or motive to matters involving the declarant's will.

■ The only basis for Mrs. Nicholson's argument on this point is her interpretation of the language of the state of mind exception, and no authority is cited in support of it. As can be seen from the text quoted above, her argument is *without merit* because it is clear that the admissibility of statements of intent, plan, or motive are not limited to matters concerning the declarant's will. Rather, only statements of memory or belief are limited by the last clause of the exception.

The case law involving the state of mind exception indicates that it applies to testimony concerning the victim's intent to do something in the future. *State v. Abernathy*, 265 Ark. 218, 577 S.W.2d 591 (1989); *Scherrer v. State*, 294 Ark. 227, 742 S.W.2d 877 (1988).

■ In her brief, Mrs. Nicholson mentions, almost as an aside, that there was no showing that she was aware of any intention on Mr. Nicholson's part to divorce her. Relevancy of the statements about divorce was, however, not the basis of the objection made to the Trial Court, and we thus do not consider it. An appellant may not change the basis for her objection on appeal. *Shaw v. State*, 299 Ark. 474, 773 S.W.2d 827 (1989).

### 3. Expert testimony

■ Mrs. Nicholson contends the Trial Court erred when it allowed expert testimony from Spring Lutz, the EMT who was called to treat Mr. Nicholson the morning he died. She contends the prosecution violated Rule 17.1 of the Arkansas Rules of Criminal Procedure by failing to disclose the intention to have Ms. Lutz testify as an expert. Rule 17.1(a)(iv) requires the prosecutor to disclose to defense counsel "any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations, scientific tests, experiments or comparisons."

Ms. Lutz's statement had been given to defense counsel by the prosecutor. When Ms. Lutz was asked by the prosecutor to say how long she thought Mr. Nicholson had been "down," apparently meaning "dead," defense counsel objected on the basis that he had not been given information to the effect that Ms. Lutz

was to testify as an expert with respect to the time of death. The objection was overruled, but the Trial Court stated Ms. Lutz would not be allowed to testify as an expert until qualified. The prosecutor proceeded to qualify her, and defense counsel stated he would have no objection to her testifying as an expert within the area the prosecutor said he planned to examine her.

Ms. Lutz then proceeded to testify that she had arrived at the motel about four minutes after receiving the emergency call which was relayed from the Sheriff's Office. She found a cold body with blood pooling which indicated Mr. Nicholson had been dead "quite a while" and more than the ten minutes or so which would have been consistent with Mrs. Nicholson's testimony.

When the issue arose, defense counsel was given an option to interview Ms. Lutz before proceeding but did not respond to the offer from the Trial Court. In addition, there was ample testimony about the time of Mr. Nicholson's death given by the examining pathologist. When testimony has not been properly disclosed by the prosecution, the burden is on the appellant to establish that the omission was sufficient to undermine confidence in the outcome of the trial. *Scroggins* v. *State*, 312 Ark. 106, 848 S.W.2d 400 (1993). There was ample testimony, including the estimations of the forensic pathologist, that indicated the time of death. There was no undermining prejudice in this case.

### 4. Rule 4-3(h)

Pursuant to Arkansas Supreme Court Rule 4-3(h) all rulings adverse to the defendant have been reviewed. No prejudicial error has been found.

Affirmed.